1  HARMEET K. DHILLON (SBN: 207873)
   harmeet@dhillonlaw.com
2  KARIN SWEIGART (SBN: 247462)
   ksweigart@dhillonlaw.com
3  DHILLON LAW GROUP INC.
   177 Post Street, Suite 700
4  San Francisco, California 94108
   Telephone: (415) 433-1700
5  Facsimile: (415) 520-6593

6
   Attorneys for Plaintiff Kate Adams
7
                **UNITED STATES DISTRICT COURT**
8                **EASTERN DISTRICT OF CALIFORNIA**
                    **SACRAMENTO DIVISION**
9

10 | KATE ADAMS,                                    | Case Number:
   |
11 |                 Plaintiff,
   |
12 | v.                                             | **Complaint**
   |
13 | COUNTY OF SACRAMENTO, a political
   | subdivision of the state of California;
14 | SHERIFF SCOTT JONES in his individual
   | and official capacity as Sheriff of the        | **JURY TRIAL DEMANDED**
15 | County of Sacramento, and DOES 1-10,
   |
16 |                 Defendants.
   |
17

18

19

20

21

22

23

24

25

26

27

28

Complaint                                          Case No. _____

**INTRODUCTION**

1.      Plaintiff Kate Adams (hereinafter "Ms. Adams" or "Plaintiff") was the Chief of Police for the city of Rancho Cordova, California, until the events giving rise to this action resulted in her forced resignation on September 12, 2021.

2.      The Rancho Cordova Police Department falls within the jurisdiction of the Sacramento County Sheriff's Office ("SCS" or "the Department"), a subsidiary agency of the County of Sacramento, a Defendant in this action.

3.      For over twenty-seven (27) years, Ms. Adams served as a Sheriff in the Sacramento County Sheriff's Office.

4.      Plaintiff brings this action, pursuant to the laws of the State of California and 42 U.S.C. § 1983, for deprivation of her constitutional rights of procedural due process and freedom of speech, invasion of privacy, retaliation for engaging in a protected activity, violation of Cal. Gov. Code § 3304, interference with prospective economic advantage, and intentional infliction of emotional distress perpetuated by Defendants County of Sacramento ("Sacramento County"), Sheriff Scott Jones in his official and individual capacity, and DOES 1 through 10 ("Doe Defendants").

5.      Defendants constructively discharged Ms. Adams' because she exercised her First Amendment right to freedom of speech pertaining to matters of public concern, namely, condemning racist memes.

6.      Defendants constructively discharged Ms. Adams by threatening immediate termination for cause and the publication of false allegations of racism if she refused to resign surreptitiously. This threat came amidst a hostile workplace where Defendants failed to afford Ms. Adams due process during internal investigations, failed to investigate a conspiracy to defame her when she brought it to their attention, and failed to protect her from a coordinated barrage of baseless accusations. The threat of defamation and a hostile workplace effectively forced Ms. Adams to resign.

7.      On information and belief, Defendants were motivated to force Ms. Adams to resign so that the Sacramento County Sheriff's Office, and Defendant Jones in particular, could avoid media coverage of (i) terminating Ms. Adams over the demonstrably false allegation that she had displayed racist beliefs by condemning an instance of racism to a friend; and (ii) its officers' failure to report this



2

1  purportedly racist communication by Ms. Adams for over seven (7) years.

2       8.      In so doing, Defendants deprived Ms. Adams of her Fourteenth Amendment right to

3  procedural due process by circumventing the established procedure afforded to discharged public

4  employees, as set forth under the laws of the State of California, the municipal code of the County of

5  Sacramento, and the internal policies of the Sacramento County Sheriff's Office.

6       9.      Specifically, by forcing Ms. Adams' resignation, Defendants deprived Ms. Adams of

7  the following procedural rights: (a) her right to notice of the proposed disciplinary action against her,

8  and the evidence in support thereof; (b) her right to a "Skelly" Hearing; (c) her right to seek judicial

9  review of an official determination made by Sacramento County; and (d) her right to an appeal, which

10 includes the right to present witnesses and evidence, the right to confront and cross-examine adverse

11 witnesses, and the right to have the matter determined by a neutral arbitrator with no connection to the

12 Sacramento County Sheriff's Office.

13      10.     Plaintiff further alleges that Defendants gave publicity to the investigation that led to

14 Ms. Adams' forced resignation and depicted her in a false light in such a manner that would be highly

15 offensive to a reasonable person, and with knowledge or a reckless disregard as to the falsity of the

16 publicized matter and the false light in which Ms. Adams was placed.

17                          **JURISDICTION AND VENUE**

18      11.     Ms. Adams brings this action pursuant to the laws of California and 28 U.S.C § 1983.

19 Thus, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. This

20 Court has supplemental jurisdiction over state law claims presented in this matter pursuant to 28 U.S.C.

21 § 1367, because the claims are so related to the federal constitutional claims in this action such that

22 they do not raise novel or complex issues of state law and do not substantially predominate over the

23 federal claims. There are, further, no exceptional circumstances compelling declining state law claims.

24      12.     Venue is proper in the Eastern District of California pursuant to 28 U.S.C. §

25 1391(b)(1)-(2) because the unlawful practices alleged in this Complaint occurred in the Eastern District

26 of California, and, on information and belief, all Defendants are domiciled in the Eastern District of

27 California.

28 //

Complaint                                                                                   Case No.

**PARTIES**

13.     Plaintiff Adams is a resident of Rocklin, California. She was employed by the Sacramento County Sheriff's Office from 1994 until her forced resignation on September 12, 2021.

14.     Defendant Sacramento County was at all times alleged herein, a California governmental entity charged with overseeing the Sacramento County Sheriff's Office, which was responsible for appointing and promoting SCS employees, and for the supervision, training, instruction, discipline, control, and conduct of said employees.

15.     At all times alleged herein, Defendant Sacramento County had the power, right, and duty to control the manner in which SCS, Defendant Jones, and DOES 1-10 carried out the objectives of their employment, and to ensure that all orders, rules, instructions, and regulations promulgated and enforced were consistent with the United States Constitution, the California Constitution, the laws of the United States, the laws of the State of California, and the laws of the municipality.

16.     Defendant Scott Jones is sued here in his individual and official capacity for damages based on actions, inaction, or conduct taken or performed under the color of state law. He has held the role of Sheriff of Sacramento County since he assumed office on December 10, 2010, a period of time that encompasses all of the relevant events discussed herein. As Sheriff, Defendant Jones is obligated under state law to supervise the official conduct of all officers and employees within the Sheriff's Office, to see that all offices under his command are filled, and that officers lawfully perform their duties. Defendant Jones has the authority to determine whether an employee under his command is terminated, and to appoint and/or remove the subordinate Doe Defendants included herein.

17.     While Plaintiff has suspicions regarding the identity of many Doe Defendants, discovery is needed to determine who was responsible for the specific allegations contained herein. Plaintiff therefore sues these Defendants by fictitious names until such time as Doe Defendants identities and level of involvement can be ascertained. Plaintiff is informed and believes, and based thereon alleges, that each of these fictitiously named Defendants were responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

//

Complaint                                                                                                    Case No.

**GENERAL ALLEGATIONS**

18.     Plaintiff Kate Adams began her career in the Sacramento County Sheriff's Office ("SCS" or "the Department") in 1994.

19.     For over twenty-seven (27) years, Ms. Adams served the citizens of Sacramento County, earning a reputation as a dedicated, kind, and community-oriented law enforcement officer.[1]

20.     In particular, Ms. Adams was dedicated to eliminating racial profiling within the Department by training officers on implicit bias and forming a collaborative partnership with the Sacramento Chapter of the NAACP.[2]

21.     On September 12, 2021, Ms. Adams was forced to resign from her career in public service because, over seven (7) years earlier, she had engaged in private speech that condemned a racist meme she had received.

22.     The private speech at issue occurred on New Year's Eve, 2013. On that evening, Ms. Adams was engaged in a friendly, casual text message conversation with then-Sergeant Morrisey. In this conversation, the two exchanged Happy New Year's wishes and Ms. Adams shared videos of her children playing.

23.     At that time, Ms. Adams and Sergeant Morrisey were friends, and had been since the late-1990s when both were starting their careers in the Department.

24.     During their text conversation on New Year's Eve, 2013, Ms. Adams sent Morrisey a message stating: "Some rude racist just sent this!!", along with a horribly racist meme that she had received. Morrisey replied, "That's not right." Ms. Adams then sent a similar meme with the caption, "Oh, and just in case u [sic.] think I encourage this . . ." What Ms. Adams included after those ellipses is a mystery, as it was omitted from the grainy screenshots provided to her, and relied upon, by the Department's investigation.

25.     At no point in the text message exchange did Ms. Adams state or imply that she found the memes humorous or agreed with their racist message.

---

[1] Rancho Cordova Police Department Website: News, *Rancho Cordova Chief of Police Kate Adams Retires*, (Sep. 16, 2021), https://www.ranchocordovapd.com/Home/Components/News/News/4270/2312.
[2] *See* Letter from Ida Sydnor, President of Sacramento Chapter of NAACP, to Kate Adams (then using her maiden name, Gooler), *Certificate of Appreciation*, Ex. A.



Complaint                                                                                    Case No.

26.     Rather, a review of the text message conversation clearly demonstrates that Ms. Adams was condemning the memes and their content.

27.     For the next seven (7) years, Morrisey neither reported Ms. Adams' messages to a supervisor as inappropriate, nor even so much as mentioned the messages again to Ms. Adams.

28.     In or around February 2019, a Rocklin city official contacted Ms. Adams and informed her of possible misconduct by fellow Sheriff's Captain LeeAnneDra Marchese. Specifically, the city official informed Ms. Adams that Marchese had instructed on-duty SCS officers to install unauthorized surveillance cameras in a neighboring county.

29.     Pursuant to her duty as an SCS officer, Ms. Adams forwarded the allegation regarding Marchese to the Department's Internal Affairs Division.

30.     The standard operating procedure for an Internal Affairs investigation required that Marchese be notified that it had been Ms. Adams who forwarded the complaint against her.

31.     Shortly after this incident, a slew of anonymous and false complaints were submitted accusing Ms. Adams of misconduct. Up until that point, Ms. Adams had earned an unblemished reputation for good conduct, never having had a complaint filed against her in over twenty-five (25) years of service as a law enforcement officer.

32.     The first complaint, filed on November 11, 2019, alleged that Ms. Adams had improperly used her home retention vehicle to transport her daughter to softball practice, and that she had used a homophobic slur at one of her daughter's softball events. The Department's Internal Affairs Division fully investigated each of these allegations, and formally concluded that they were baseless (Ms. Adams had not even attended the specific softball event referenced in the complaint), clearing Ms. Adams of any wrongdoing.

33.     Less than two (2) months later, on January 1, 2020, a second complaint was filed that repeated the recently disproven allegation that Ms. Adams had improperly used her home retention vehicle to transport her daughter to softball practice. After investigating this allegation a second time, the Department again concluded that it was baseless, and Ms. Adams was cleared of any wrongdoing.

34.     In March 2020, Ms. Adams was selected as the Chief of Police for the City of Rancho Cordova.



Complaint                                                                 Case No.

35. Shortly thereafter, a third anonymous complaint was made against Ms. Adams, which rehashed the same allegations made in the previous two complaints.

36. After conducting its own review, the City of Rancho Cordova concluded that the third anonymous complaint made against Ms. Adams in the span of four (4) months was baseless as well.

37. The third anonymous complaint not only included the same allegations as the first two complaints against Ms. Adams, but was clearly written by someone in the Department who had known Ms. Adams for many years.

38. Increasingly, Ms. Adams became suspicious that either Marchese or Morrisey's wife, Assistant Commander Gail Vasquez, had been behind the anonymous complaints in retaliation for the complaint that Ms. Adams had previously forwarded regarding Marchese. This suspicion was further supported by the fact that both Ms. Adams's and Marchese's daughters played in the same softball league, and a softball event was the location where two of the alleged false incidents were to have taken place.

39. In July 2020, Ms. Adams was working from home, with authorization to do so, when she went to her vehicle to pick up lunch. As she sat in her vehicle preparing to leave, she noticed Marchese driving down her street. When Marchese noticed Ms. Adams, she became furtive, quickly made a U-turn, and sped away.

40. On that day in July 2020, Marchese had no legitimate reason to be near Ms. Adams' home. Marchese did not live or work in the vicinity, and on that particular day, she had been assigned to work twenty-nine (29) miles away at the County Courthouse in Downtown Sacramento.

41. This incident provided compelling support to Ms. Adams' theory that Marchese was attempting to catch Ms. Adams violating some Department policy – such as unauthorized use of her service vehicle (as Marchese is believed to have previously reported regarding Ms. Adams) or working from home without authorization – to further retaliate against her. This theory was corroborated further by the fact that Marchese had provided a photograph of Ms. Adams' former residence to the investigator and falsely accused Ms. Adams of making a false accusation relating to property damage.

42. Deeply concerned, on July 24, 2020, Ms. Adams submitted a formal complaint with County of Sacramento's Equal Employment Opportunity (EEO) office against Marchese for

7



harassment and retaliatory behavior. This was a protected activity under Cal. Gov. Code § 12940(h).

43.     When Marchese was interviewed regarding Ms. Adams' EEO complaint against her, Marchese first introduced the allegation that Ms. Adams had sent racist memes to her and Morrisey on New Year's Eve, 2013.

44.     This act represents a blatant attempt by Marchese to distract from the investigation into her own misconduct.

45.     Although Marchese had disposed of the phone on which she received the memes from Ms. Adams long before her EEO interview, miraculously, she had printed screenshots of this text exchange devoid of its larger context.

46.     In her interview, Marchese went to great lengths to convey that she had made it "very clear" to her supervisors over the years that she had observed Ms. Adams displaying racist behavior; yet, the record reflects that she did not explain why she waited over seven (7) years to report the printed screenshots that allegedly show Ms. Adams evincing racist beliefs.

47.     Pursuant to SCS Policy #601, the Department directs "[a]ny individual who . . . is aware of discrimination . . . in a County work situation", to "immediately report such action or inaction." David Devine, et al., *Policy #601: Discrimination, Harassment, and Retaliation*, at 2-3, *rev.* (Aug. 2020).

48.     Soon after informing the investigator that she had screenshots of the racist memes that Ms. Adams had sent her, and completely unrelated to any question she had been asked, Marchese confidently stated: " . . . I know also that Morrisey received the same, the same one that I did. And if I know Morrisey and I have for years he will have it as well."

49.     Somehow, Marchese was well aware that Morrisey had received and printed screenshots of the same memes that she had received from Ms. Adams over seven (7) years ago, yet inexplicably, he also had failed to report them to his supervisors.

50.     To provide additional context: Morrisey specializes in cell phone forensics for the Department, and possesses extensive expertise in recovering lost, deleted, or erased cell phone content.

51.     On information and belief, Doe Defendants collectively hid and distorted the original context and language accompanying the memes to suggest that Ms. Adams somehow endorsed or

Complaint                                                                                                Case No.

supported the memes' racist message.

52.     Marchese's attempt to distract from the investigation into her own misconduct by levying incendiary but baseless charges against Ms. Adams proved successful: in a painfully ironic twist, the independent investigation initially launched to determine whether Marchese had harassed Ms. Adams by filing false anonymous complaints against her, transformed into an investigation of Ms. Adams based on the very same complaints made by Marchese.

53.     While the investigation concerning the false allegations against Ms. Adams was ongoing – despite the fact that she had been credibly accused of harassment, and neglected to report a purportedly racist communication from a fellow Sheriff's Captain for over seven (7) years – the Department promoted Marchese.

54.     When SCS seeks to discipline an employee, Department policy clearly states that "management bears the burden of proving that: (1) there is 'good cause' to discipline the employee, and (2) the level of discipline is appropriate given the offense and any other relevant considerations." Sacramento County Sheriff's Office, *County Discipline Manual*, at 12, *rev.* (Nov. 2016) (hereafter, "Discipline Manual").

55.     The Department's Discipline Manual provides supervisors with the following advice: "Bearing the burden of proof means that management must have evidence – testimony, business records, etc., to support the facts outlined in the order of discipline. YOU MUST PROVE THE FACTS." *Discipline Manual*, at 14 (emphasis in original).

56.     Before the Department may administer formal discipline against an employee, the SCS Discipline Manual sets forth a five (5) step procedure that must be followed:

    First.     Notice of Proposed Disciplinary Action: To initiate the process, the employee first must be provided with a notice that "outlines the reasons for the discipline and the proposed penalty. . . . . At this point the discipline is only **proposed**, not final. The employee has the right to have copies of **all** the materials upon which the disciplinary action is based."

    Second.     Skelly Hearing: "Before the final Order can be administered, the employee has the option to request . . . an informal meeting with the Department Head's

9



designated representative," known as a "Skelly" Hearing. *See generally Skelly v. State Personnel Bd.*, 539 P.2d 774 (Cal. 1975). This hearing is intended to offer the employee a "chance to present information demonstrating or asserting that the facts are wrong or incomplete, the discipline is too severe because there are mitigating factors, or it is being imposed unfairly." After the employee has been provided with "an opportunity . . . to articulate his/her defense to the proposed charges as well as to identify any mitigating circumstances," the officer overseeing the hearing is allowed to present his or her view "regarding the appropriateness of the proposed penalty", which the "appointing authority" overseeing the investigation is free to accept or reject.

Third.  Order of Disciplinary Action: "After the Skelly hearing and before discipline is imposed, the employee must receive a final 'Order of Disciplinary Action'," containing: "[i] a statement of the reasons for the disciplinary action; [ii] the effective date of the discipline; [iii] the facts upon which the discipline is based; [and] [iv] a statement of appeal rights."

Fourth.  Appeal hearing with Civil Service Commission or Arbitrator: After an employee receives an Order of Disciplinary action, he or she "has fifteen (15) calendar days to file an appeal with the Office of Labor Relations (if represented) or the Civil Service Commission (if unrepresented)." Appeals filed by "represented employees go to binding arbitration." In an appeal heard before an arbitrator, the employee is given an opportunity to present his or her case to a neutral party, confront his or her accusers, call witnesses who testify under penalty of perjury, and to cross examine those witnesses.

Fifth.  Adoption, modification, final decision on arbitration or Civil Service Commission decision: If an appeal hearing is conducted by binding arbitration, the arbitrator issues the final decision on the matter. The Department's Civil Service Commission may not amend or alter the arbitrator's decision. *Discipline Manual*, at 28-30 (emphasis original).



Complaint                                                      Case No.

57.     At no point did the Department provide Ms. Adams with a Notice of Proposed Disciplinary Action, a Skelly Hearing, an Order of Disciplinary Action, or an opportunity to request an appeal hearing before a neutral arbitrator or the Civil Service Commission.

58.     As conveyed to Ms. Adams via emails with her union counsel, upon conclusion of the investigation, the Department discretely presented Ms. Adams with a Hobson's choice: she could either (a) be terminated by SCS and publicly mischaracterized as a racist, thereby tarnishing her reputation and subjecting her family to ridicule; or (b) quietly resign from a career she had built over twenty-seven (27) years and avoid being falsely maligned as a racist in the press.

59.     On information and belief, rather than afford Ms. Adams the procedural protections outlined in its policies, Defendant SCS – out of a desire to conceal from the public the fact that its officers had failed to report a purportedly racist communication by a fellow officer for over seven (7) years – reached its decision solely based upon a woefully inadequate, private investigation that consisted of separate interviews of Ms. Adams and her accusers.

60.     On information and belief, the Department reasoned that, although the evidence did not show that there was racist intent behind the memes shared by Ms. Adams, her resignation was the best way to avoid a "media circus" that could harm the reputations and political futures of all involved, particularly Sheriff Scott Jones, who had already announced his intention to run for Congress, and who was perceived by many to have a negative track record on race relations.

61.     Rather than contend with the Department in the court of public opinion, and thereby subject herself and her family to a predictable slew of unfavorable, sensationalized media coverage that defamed her character and could potentially put her family in danger, Ms. Adams opted to resign under duress on September 12, 2021. The Defendants' threat to make the false allegations public unless she resigned, and the terrifying potential consequences for her family if those allegations played out in the media, was paramount in her decision to retire.

62.     At the direction of Defendant Jones, the Department deviated from its standard review procedure for investigations into officer misconduct: rather than allow the Sacramento County Inspector General to conduct the review of the investigation, Sheriff Jones selected John McGinnis – a close personal friend and political endorser – to perform the review.

63.     Unsurprisingly, the soundness of the investigation overseen by Defendant Jones was affirmed by his self-selected ally, McGinnis, who rubber-stamped the investigation without examining why the investigator had failed to acquire the complete thread of text messages between Ms. Adams and Morrisey, or determine who was behind the series of baseless accusations against Ms. Adams that had made her workplace a hostile environment.

64.     Although public disclosures by the Department state otherwise, at no point during the investigation did the Department place Ms. Adams on administrative leave. Ms. Adams served as the Rancho Cordova Chief of Police until the end of her tenure with the Department.

65.     Under Sacramento County Code § 2.78.830, an employee who resigns and provides at least two (2) weeks' notice is allowed to request that his or her resignation be considered in "good standing". Sac. Cnty. Code § 2.78.830.

66.     Consistent with its desire to keep the circumstances surrounding the investigation hidden from public view, the Department permitted Ms. Adams to resign in good standing, regardless of the fact that, in the Department's estimation, she had committed 'misconduct' sufficient to warrant her immediate termination merely because she had failed to recall the details of private text messages condemning racism that were sent seven (7) years prior to a friend.

67.     Because the Department forced Ms. Adams' resignation rather than having to reach a decision to terminate her, Ms. Adams was deprived of her right to seek judicial review of the Department's determination, as provided for in Chapter 1.06 of the Sacramento County Code. *See* Sac. Cnty. Code §§ 1.06.010 – 1.06.040.

68.     Moreover, the Department's conduct in forcing Ms. Adams' resignation contravened the California Public Safety Officer Procedural Bill of Rights, Cal. Gov. Code §§ 3300 *et seq.*, which provides that "[n]o chief of police may be removed by a public agency, or appointing authority, without providing the chief of police with written notice and the reason or reasons therefor and an opportunity for administrative appeal." Cal. Gov. Code § 3304(c).

69.     On September 7, 2021, the Rancho Cordova City Council publicly thanked and heaped



Complaint                                                                                          Case No.

praise upon Ms. Adams as she officially announced her 'retirement' as the City's Chief of Police.[3]

70.     After her retirement from the Department, Ms. Adams, who already held a second position as an adjunct professor at William Jessup University, applied for a job with the California Commission on Peace Officer Standards (POST). After passing POST's entry exam with a score of 90 out of 100, an interview was scheduled for April 13, 2022.

71.     However, on March 4, 2022, The Sacramento Bee ("the Bee") published an article regarding the investigation that led to Ms. Adams' forced resignation from the Department.

72.     The Bee article was based on an open letter published by the President of the Sacramento chapter of the NAACP, Betty Williams, as well as statements made by a Sacramento County spokesperson in response to the Bee's request for comment.

73.     The Bee article contained significant factual inaccuracies, including: (1) that Ms. Adams was fired in part for using homophobic slurs, (2) that Ms. Adams was placed on administrative leave prior to her resignation, and (3) that Ms. Adams retired before the SCS could determine and implement a formal disciplinary action.

74.     These falsehoods originated both from the source of Betty Williams' open letter, and comments made by the Sacramento County spokesperson, who falsely informed the Bee that Ms. Adams had "voluntarily retired before the Sheriff's Office could determine formal disciplinary action." In truth, as alleged above, the Sheriff's Office had informed Ms. Adams that she would be terminated if she refused to retire.

75.     On information and belief, one of the Doe Defendants was the source for Betty Williams' open letter.

76.     Most egregiously, the source of the Bee article omitted all context surrounding the meme sent by Ms. Adams, which demonstrates that she had condemned the meme and its message.

77.     After the Bee article published its article, Ms. Adams endured a series of negative employment determinations due to the false public perception that she was a racist or had shared a racist meme in support of its content.

---

[3] *See* https://youtu.be/CnzS5pogri4?t=800.



Complaint                                                                                              Case No.

78.     On March 10, 2022, William Jessup University requested that Ms. Adams resign from her position as adjunct professor.

79.     On April 13, 2022, POST informed Ms. Adams that, in light of the article, it could not hire her, despite her extensive experience and excellent exam scores.

80.     As a direct result of Defendants' falsehoods and retaliation, Ms. Adams was forced to endure significant blows to her professional career and personal reputation.

81.     Since June 2021, Ms. Adams has sought counseling to treat the anxiety, stress, and depression caused by the false allegations asserted against her, the sham investigation that resulted in her forced resignation, the Bee article that falsely maligned her character, the unsupported attacks on her personal character, and her resulting inability to find alternative means of employment.

**COUNT I**

**DENIAL OF PROCEDURAL DUE PROCESS (42 U.S.C. § 1983)**

**AGAINST DEFENDANT SACRAMENTO COUNTY AND DEFENDANT JONES**

82.     Ms. Adams realleges and reincorporates Paragraphs 1 through 81 as if set forth fully herein.

83.     "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth 'or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

84.     Public employment constitutes a protected property interest under the Fourteenth Amendment. *Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir. 2001).

85.     Before a governmental entity may take punitive action against a permanent civil service employee, the California Supreme Court has ruled that procedural due process requires, "at a minimum, . . . notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline." *Skelly*, 539 P.2d at 788–89.

86.     In addition, procedural due process requires that investigations into alleged misconduct by a public employee be conducted by a "reasonably impartial, noninvolved reviewer." *Stanton v. City of W. Sacramento*, 226 Cal. App. 3d 1438, 1443, 277 Cal. Rptr. 478, 481 (Ct. App.

14



Complaint                                                                                    Case No.

1991).

87.     When a public employee is "terminated for reasons 'sufficiently serious to stigmatize or otherwise burden the individual so that he is not able to take advantage of other employment opportunities,' and the public employer publicizes those stigmatizing charges,' 'the process' that must be afforded to the employee is a 'name-clearing' hearing." *Fitzgerald v. City of Fresno*, No. 121CV01409AWISAB, 2022 WL 1204707, at *11 (E.D. Cal. Apr. 22, 2022) (citing *Perez v. City of Roseville*, 926 F.3d 511, 523 (9th Cir. 2019)).

88.     As the above allegations demonstrate, the Municipal Defendants constructively discharged Ms. Adams by informing her that if she did not resign, they would terminate her and falsely malign her in the press as a racist. Ms. Adams did not voluntarily resign her position as Sheriff of Rancho Cordova, but was coerced into doing so by the Municipal Defendants under threat of character assassination.

89.     Because the Municipal Defendants constructively discharged Ms. Adams to deliberately avoid the media coverage that would accompany terminating her, Ms. Adams was denied the procedure afforded to discharged employees – as required by SCS policy, the Sacramento County Municipal Code, the California Government Code, and the United States Constitution – including: notice of the proposed disciplinary action against her; a Skelly hearing; a "name clearing hearing"; an official order of disciplinary action; and the right to request an appeal hearing, which encompasses the attendant rights of presenting evidence and testimony, confronting and cross-examining adverse witnesses, and having her matter decided by a neutral arbitrator. *See* Cal. Gov't Code Ann. § 3304.5; Sac. Cnty. Sheriff's Office, *Discipline Manual*, at 28-30; *Skelly*, 539 P.2d at 788–89.

90.     That Defendant Jones selected John McGinnis, a close personal friend and political endorser, to review the propriety of the investigation into Ms. Adams, rather than the Sacramento County Inspector General as is the standard practice for Internal Affairs investigation, violates the procedural due process requirement that such investigations be conducted by a "reasonably impartial, noninvolved reviewer." *Stanton*, 226 Cal. App. 3d at 1443, 277 Cal. Rptr. at 481.

91.     The Municipal Defendants' actions, as alleged, deprived Ms. Adams of her public employment, a property interest protected under the Fourteenth Amendment.



92.     WHEREFORE, Ms. Adams requests that judgment be entered against Municipal Defendants, ordering:

       a)   Declaratory relief declaring that Municipal Defendants' conduct, as set forth above, violated Ms. Adams' constitutional right to procedural due process under the Fourteenth Amendment;

       b)   An award for reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

       c)   An award for general, specific, presumed, and nominal damages according to proof; and

       d)   Other relief as determined appropriate by the Court.

## COUNT II

## DEPRIVATION OF FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH

## (42 U.S.C. § 1983)

## AGAINST DEFENDANT SACRAMENTO COUNTY AND DEFENDANT JONES

93.     Ms. Adams realleges and reincorporates the allegations made in Paragraphs 1 through 92 as if set forth fully herein.

94.     Ms. Adams brings this claim against Defendant Sacramento County and Defendant Jones in his individual capacity ("Municipal Defendants"), under federal statute 42 U.S.C. § 1983, which provides that any person or persons who, under color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party.

95.     The First Amendment of the United States Constitution states: "Congress shall make no law abridging the freedom of speech, or the press." The First Amendment has been interpreted to apply to all government organizations in the United States. It applies to state and local governments through operation of the Fourteenth Amendment Due Process Clause, which incorporates the free speech protections of the First Amendment.

96.     Public employees have the right not to have the government restrict their speech based on the speech's viewpoint. Such restrictions are rarely permitted. *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 829 (1995). The rationale for prohibiting the suppression of



public employee speech pertaining to matters of public interest is to protect employees from their superiors who may exercise their authority because the superior disagrees with the content of the employee's speech. *Rankin v. McPherson*, 483 U.S. 378 (1987). The government must meet a high standard for restricting speech in a public forum. State action designed to retaliate against, and chill free speech strikes at the very heart of the First Amendment.

97.     The United States Supreme Court has developed a test to determine when First Amendment protection attaches to a public employee's speech. A public employee's speech is protected if, (1) the speech is a matter of "public concern"; (2) the employee spoke as a private citizen and not a public employee (i.e., the speech is not pursuant to "official duties"); and (3) the employee's speech interest outweighs the agency's interest in efficiency and effectiveness. *Eng v. Cooley*, 552 F.3d 1062, 1070-71 (9th Cir. 2009).

98.     Municipal Defendants deprived Ms. Adams of her rights under the First Amendment when they forced her to resign based on private speech that she made regarding a matter of public concern, namely, condemning an example of racism to a friend.

99.     Ms. Adams' speech was a substantial or motivating factor for the adverse employment actions taken against her by Defendants because it served as the basis for her forced resignation.

100.     The conduct of the Municipal Defendants, in their official and/or individual capacities, at all times relevant as set forth above, constitutes violations of Ms. Adams' First Amendment Rights under color of state law.

101.     Defendants' actions, inaction, and conduct have caused and continue to cause Ms. Adams a substantial loss of reputation, professional injury, promotional opportunities and other employment benefits, attorneys' fees, medical expenses, humiliation, embarrassment, and anguish, all to her damage in an amount according to proof.

102.     Defendants' actions, as alleged herein, were intentional, outrageous, despicable, oppressive, and done with substantial certainty that they would injure Ms. Adams and cause her mental anguish, anxiety, and distress. Defendants' acts were done in conscious disregard of the risk of severe emotional harm to Ms. Adams, constituting actual malice, and thereby entitling Ms. Adams to punitive damages against the Defendants.



Complaint                                                                                          Case No.

103.    WHEREFORE, Ms. Adams requests that judgment be entered against Defendants Sacramento County and Jones, ordering that:

    a)    Declaratory relief declaring the Defendants' conduct, as set forth above, violated Ms. Adams Constitutional right to free speech;

    b)    Preliminary and permanent injunctions requiring all Defendants to, in good faith, issue public retractions that correct the factual record regarding the investigation that led Ms. Adams resignation, and the context in which the memes were sent;

    c)    An award for reasonable attorney's fees and costs, pursuant to 42 U.S.C. § 1988;

    d)    An award for general, specific, presumed, nominal, and punitive damages according to proof; and

    e)    Other relief as determined appropriate by the Court.

<u>**COUNT III**</u>

<u>**CONSPIRACY TO DEPRIVE PLAINTIFF OF FIRST AMENDMENT RIGHTS**</u>

<u>**(42 U.S.C. § 1983)**</u>

<u>**AGAINST ALL DEFENDANTS**</u>

104.    Ms. Adams realleges and reincorporates Paragraphs 1 through 103 as if set forth fully herein.

105.    Ms. Adams brings this claim against all Defendants under federal statute 42 U.S.C. § 1983, which, as stated above, provides that any person or persons who, under color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party.

106.    To establish a conspiracy under § 1983, a plaintiff is required to show "(1) the existence of an express or implied agreement among the defendant[s] [] to deprive him of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement." *Avalos v. Baca*, 517 F. Supp. 2d 1156, 1169 (C.D. Cal. 2007), *aff'd*, 596 F.3d 583 (9th Cir. 2010).

107.    The "requisite causal connection" between a given defendant's actions and an actual deprivation of the plaintiff's constitutional rights "can be established not only by some kind of direct personal participation in the deprivation, but also by **setting in motion a series of acts by others** which

18



the actor **knows or reasonably should know would cause others to inflict the constitutional injury**." *Armstrong v. Reynolds*, 22 F.4th 1058, 1070 (9th Cir. 2022) (emphasis added) (internal citation omitted).

108.　A public employee may be found liable for actions taken in a private capacity under § 1983 "if [he] [or] she conspired or entered joint action with a state actor." *Id.* (citation omitted).

109.　"[T]he existence of an agreement or meeting of the minds to violate constitutional rights. . . . may be inferred on the basis of circumstantial evidence. . . . [E]ach participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (internal quotation omitted). A plaintiff is not required to show that such an agreement was "overt." *Id.* (citation omitted).

110.　As the Ninth Circuit has held, a showing that the alleged conspirators have committed acts that " 'are unlikely to have been undertaken without an agreement' may allow a jury to infer the existence of a conspiracy." *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) (quoting *Kunik v. Racine County*, 946 F.2d 1574, 1580 (7th Cir.1991)).

111.　On information and belief, Doe Defendants entered into an implicit or explicit agreement to mischaracterize Ms. Adams' past communications to them, made at a time when they were friends with Ms. Adams, to falsely depict her as a racist, and thereby secure her forced resignation from the Department.

112.　Doe Defendants knew or should have known that such conduct would set in motion a series of events that would deprive Ms. Adams of her constitutional rights, namely, her forced resignation for exercising her First Amendment right to free speech as a private citizen.

113.　That multiple Doe Defendants each printed out screenshots of their text message conversations with Ms. Adams from seven (7) years prior, yet stopped short of reporting the incident to their supervisors, and that one Doe Defendant appeared certain, in her interview regarding Ms. Adams allegation of harassment against her, that not only had other Doe Defendants received the memes, but had printed them out as well, are actions that are unlikely to have been taken without an agreement, and therefore, strongly supports the inference of a conspiracy.

114.     As explained more fully above, Defendant Sacramento County and Defendant Jones deprived Ms. Adams of her rights under the First Amendment when they forced her to resign based on private speech that she made condemning an example of racism to a friend.

115.     On information and belief, Ms. Adams alleges that the Doe Defendants entered into a conspiracy with the Municipal Defendants, whereby the parties shared the implicit objective of terminating Ms. Adams for engaging in First Amendment protected speech: the Doe Defendants having done so to deflect from the investigation into their own misconduct and inflict retribution on Ms. Adams, and the Municipal Defendants having done so to avoid uncomfortable media attention regarding racism within the Department, which threatened the political futures of all involved.

116.     WHEREFORE, Ms. Adams requests that judgment be entered against Defendants, ordering:

    a)    Declaratory relief declaring the Defendants' conduct, as set forth above, violated Ms. Adams' Constitutional right to free speech;

    b)    Preliminary and permanent injunctions requiring all Defendants to comply in good faith and issue public retractions that correct the factual record regarding the investigation that led Ms. Adams resignation, and the context in which the text messages were sent.

    c)    An award for reasonable attorney's fees and costs, pursuant to 42 U.S.C. § 1988;

    d)    An award for general, specific, presumed, and nominal damages according to proof; and

    e)    Other relief as determined appropriate by the Court.

### COUNT IV

### INVASION OF PRIVACY (FALSE LIGHT)

### AGAINST ALL DEFENDANTS

117.     Ms. Adams realleges and reincorporates Paragraphs 1 through 116 as if set forth fully herein.

118.     In attempts to discredit Ms. Adams, and deflect negative coverage of their own misconduct, the Defendants published materials and narratives which depict Ms. Adams in a false light,

20



Complaint                  Case No.

out of the context in which the communications were made.

119.     Rather than providing the context of the memes at issue – which demonstrates that far from endorsing their content, Ms. Adams had condemned them – the Defendants' publications mischaracterized her communications and placed her in a false light as a racist.

120.     The false light created by Defendants' disclosure – that Ms. Adams was terminated for exhibiting racist behavior – is, and would be, highly offensive to a reasonable person in Ms. Adams' position.

121.     When Municipal Defendants were asked for comment by the Bee, they falsely stated that Ms. Adams had retired to avoid discipline. In truth, Municipal Defendants had determined that Ms. Adams would be terminated, and forced Ms. Adams to resign in order to avoid negative media coverage.

122.     The Defendants knew that the mischaracterization provided to the Bee would create a false impression about Ms. Adams, yet they either failed to include them in their communication to the NAACP, or failed to correct the record when asked by the Bee.

123.     In conducting these acts or omissions, Defendants acted deliberately and intentionally, and with malice.

124.     As a proximate result of Defendants' conduct, Ms. Adams has suffered irreparable injury and damage, and she will continue to suffer actual injury, including emotional distress resulting from the loss of career opportunities and damage to her mental health and personal reputation.

125.     The career opportunities lost by Ms. Adams as a result of the Defendants' action include, but are not limited to, her position as an adjunct professor for William and Jessup University, and her likely hiring by POST.

126.     WHEREFORE, Ms. Adams requests that judgment be entered against Defendants, ordering:

a)     An award for general, specific, presumed, and nominal damages according to proof; and

b)     Other relief as determined appropriate by the Court.



Complaint                                                                                                          Case No.

**COUNT V**

**CONSPIRACY TO COMMIT INVASION OF PRIVACY (FALSE LIGHT)**

**AGAINST DOE DEFENDANTS**

127.     Ms. Adams realleges and reincorporates Paragraphs 1 through 126 as if set forth fully herein.

128.     To establish a civil conspiracy under California law, a plaintiff must establish: "(1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from an act done in furtherance of the common design." *I-CA Enterprises, Inc. v. Palram Americas, Inc.*, 235 Cal. App. 4th 257, 272, fn. 2, 185 Cal. Rptr. 3d 24, 36, fn. 2 (2015) (internal quotations and citations omitted).

129.     As previously alleged, in attempts to discredit Ms. Adams, the Doe Defendants published materials and narratives which depict Ms. Adams in a false light, out of the context in which the communications were made.

130.     On information and belief, the Doe Defendants formed and operated a conspiracy to malign Ms. Adams' reputation by falsely depicting her as a racist.

131.     As a result of the Doe Defendants' conspiracy to falsely depict her as a racist, Ms. Adams suffered damages, including, but not limited to, the loss of income, the loss of employee benefits, the loss of future employment opportunities, the cost of seeing a therapist, attorneys' fees, and other damages to be alleged later.

132.     WHEREFORE, Ms. Adams requests that judgment be entered against Doe Defendants, ordering:

           a)     An award for general, specific, presumed, and nominal damages according to proof; and

           b)     Other relief as determined appropriate by the Court.

**COUNT VI**

**RETALIATION (GOV. CODE § 12940(h))**

**AGAINST DEFENDANT SACRAMENTO COUNTY AND DEFENDANT JONES**

133.     Ms. Adams realleges and reincorporates Paragraphs 1 through 132 as if set forth fully herein.

Complaint                          Case No.

134.     Cal. Gov. Code § 12940(h) prohibits employers from retaliating against employees for participating in a protected activity.

135.     Ms. Adams engaged in a protected activity when she complained to management about a hostile work environment created by a series of unfounded complaints made against her, which she reasonably and in good faith believed violated the California Fair Employment and Housing Act ("FEHA").

136.     After engaging in this protected activity, Ms. Adams was subjected to retaliation as set forth in this Complaint. Ms. Adams complained about unfounded accusations against her and was then forced to resign based on her response to another unfounded accusation of racism. She was seeking protection through a protected activity, and instead, the Department treated her with hostility.

137.     Pursuant to Cal. Gov. Code § 12940(h), Defendants are liable for retaliating against Ms. Adams for complaining about a practice, namely, the conspiracy to make unfounded complaints against her, that she reasonably and in good faith believed were forbidden under FEHA. Ms. Adams was then subjected to a hostile work environment and constructively discharged precisely because she engaged in activities protected under FEHA.

138.     WHEREFORE, Ms. Adams requests that judgment be entered against Municipal Defendants, ordering that:

a)     Declaratory relief declaring the Municipal Defendants retaliated against her in violation of Cal. Gov. Code § 12940(h);

b)     An award for reasonable attorney's fees and costs, pursuant to Cal. Gov. Code § 12965;

c)     An award for general, specific, presumed, and nominal damages according to proof; and

d)     Other relief as determined appropriate by the Court.

//
//
//
//



Complaint                                                                                                        Case No.

**COUNT VII**

**VIOLATION OF THE CALIFORNIA PUBLIC SAFETY OFFICE PROCEDURAL BILL OF**

**RIGHTS, GOV. CODE §§ 3300, *et seq*.**

**AGAINST DEFENDANT SACRAMENTO COUNTY**

139.    Ms. Adams realleges and reincorporates Paragraphs 1 through 138 as if set forth fully herein.

140.    The Department's conduct in forcing Ms. Adams' resignation contravened the California Public Safety Officer Procedural Bill of Rights, Cal. Gov. Code §§ 3300 *et seq.*, which provides that "[n]o chief of police may be removed by a public agency, or appointing authority, without providing the chief of police with written notice and the reason or reasons therefor and an opportunity for administrative appeal." Cal. Gov. Code § 3304(c).

141.    Ms. Adams was constructively discharged, as alleged in this Complaint, without being provided with written notice and the reason(s) for her discharge, or an opportunity for administrative appeal. Instead, she was forced to resign under duress.

142.    WHEREFORE, Ms. Adams requests that judgment be entered against Municipal Defendants, ordering:

        a)    Declaratory relief declaring the Department violated the California Public Safety Officer Procedural Bill of Rights, Cal. Gov. Code §§ 3300 *et seq.*; and

        b)    A civil penalty of $25,000 for each violation, pursuant to Cal. Gov. Code § 3309.5(e);

        c)    An award for general, specific, presumed and nominal damages according to proof; and

        d)    Other relief as determined appropriate by the Court.

**COUNT VIII**

**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE –**

**AGAINST DOE DEFENDANTS**

143.    Ms. Adams realleges and reincorporates Paragraphs 1 through 142 as if set forth fully herein.

Complaint                                                                                                    Case No.

144.    To state a claim for intentional interference with prospective economic advantage, a plaintiff must show: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's acts. *Reeves v. Hanlon*, 95 P.3d 513, 520, fn. 6 (2004).

145.    Under California law, "a plaintiff may recover damages for intentional interference with an at-will employment relation under the same California standard applicable to claims for intentional interference with prospective economic advantage." *Id*.

146.    Ms. Adams was in an economic relationship with SCS, with the probability of future economic benefit.

147.    Doe Defendants had actual knowledge of Ms. Adams' economic relationship with SCS.

148.    As alleged above, Doe Defendants' intentionally mischaracterized the context of communications that Ms. Adams had sent, in a bad faith effort to persuade SCS to terminate Ms. Adams.

149.    Doe Defendants' intentional disruption of Ms. Adams' employment relationship ultimately led SCS to force Ms. Adams' resignation.

150.    As a result of the Doe Defendants' actions, Ms. Adams suffered economic harm, including, but not limited to, the loss of future income, the loss of employee benefits, and the loss of future employment opportunities.

151.    WHEREFORE, Ms. Adams requests that judgment be entered against Doe Defendants, ordering:

        a)    An award for general, specific, presumed, and nominal damages according to proof; and

        b)    Other relief as determined appropriate by the Court.



Complaint        Case No.

## COUNT IX

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

### AGAINST DOE DEFENDANTS

152.    Ms. Adams realleges and reincorporates Paragraphs 1 through 151 as if set forth fully herein.

153.    To state a claim for IIED, "a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Yau v. Santa Margarita Ford, Inc.*, 229 Cal. App. 4th 144, 160, 176 Cal. Rptr. 3d 824, 836 (2014) (internal quotations and citations omitted).

154.    Conduct is deemed "outrageous" when it is found to "be so extreme as to exceed all bounds of that usually tolerated in a civilized society." *Id.* (internal quotations and citations omitted).

155.    Doe Defendants' false depiction of Ms. Adams as a racist constitutes outrageous conduct because it is so extreme as to exceed all bounds of that usually tolerated in a civilized society.

156.    As the circumstances described above demonstrate, Doe Defendants' inflicted emotional distress on Ms. Adams with the intention or reckless disregard of causing her emotional stress.

157.    As shown by the extensive counseling that Ms. Adams has had to seek in order to treat the significant stress, depression, and anxiety caused by Doe Defendants' conduct, Ms. Adams has suffered severe or extreme emotional distress.

158.    Doe Defendants' outrageous conduct, as alleged herein, was the actual and proximate cause of Ms. Adams' emotional distress.

159.    WHEREFORE, Ms. Adams requests that judgment be entered against Doe Defendants, ordering that:

    a)    Declaratory relief declaring the Doe Defendants intentionally inflicted economic distress on Ms. Adams;

    b)    An award for reasonable attorney's fees and costs; and



Complaint

Case No.

1        c)     An award for general, specific, presumed, and nominal damages according to

2               proof; and

3        d)     Other relief as determined appropriate by the Court.

4  Date: August 24, 2022          **DHILLON LAW GROUP INC.**

5

6               By: /s/Karin M. Sweigart
                   Karin Sweigart

7                   ksweigart@dhillonlaw.com
                   Harmeet K. Dhillon

8                   harmeet@dhillonlaw.com
                   DHILLON LAW GROUP INC.

9                   177 Post Street, Suite 700
                   San Francisco, California 94108

10                 Telephone: (415) 433-1700
                   *Counsel for Plaintiff*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



Complaint                                                   Case No.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all claims in this action of all issues so triable.


Date: August 24, 2022                          **DHILLON LAW GROUP INC.**

By: /s/ Karin M. Sweigart
Karin Sweigart
ksweigart@dhillonlaw.com
Harmeet K. Dhillon
harmeet@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
*Counsel for Plaintiff*



Complaint                                                                                    Case No.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**



Complaint                                                                    Case No.



### NATIONAL ASSOCIATION FOR THE
### ADVANCEMENT OF COLORED PEOPLE

Phone (916) 733-0434 Fax (916) 733-0437 P.O. BOX 188231 Sacramento, CA 95818

September 10, 2001

**Officers**

**President**
Ida Sydnor

**1ˢᵗ Vice President**
Marunga Merete

**2ⁿᵈ Vice President**
Diane Buffington

**3ʳᵈ Vice President**
Ann Gayles-White

**Secretary**
Richard Smith

**Financial Secretary**
Mae L. Worthy

**Treasurer**
M. Kisibulu

**Publicity Chair**
Catherine Henry

**Political Chair**
Catherine Henry

**Veterans Affairs Chair**
Ronald D. Sanders

**Executive Committee**
Alice Hoffman
Faith Gates
Henry Hines
Atty. William Poe
Rev. Archie Sims
Dr. Nate White
Peter Brisie, Attny.
Ulishioms Davis
Roshni Parsad
Shelly Bailey
Ron Sanders
Liz Duran
Dale Duran

Deputy Kate Gooler
Sacramento Sheriff's Department
711 G Street
Sacramento California, 95816

Dear Deputy Gooler,

Still fresh on our minds are recent events of this past summer concerning the question of racial tension between law enforcement officers and members of the community. These incidences have been categorized nationally as racial profiling.

On behalf of the Sacramento Chapter of the NAACP I would like to commend you on your personal efforts to ensure that law enforcement agents from the Sacramento Sheriff's Department are made aware and trained on the reality of this major concern.

It is my job as a community leader to make sure that the community is trained and I appreciate you taking the lead in making sure that law enforcement agents are trained.

In believing that our goals (of making sure that racial profiling is eliminated) are the same, I would like to present you with a Certificate of Appreciation for your service in this area.

Sincerely,

Cedric Sydnor
Youth Director

Ida Sydnor
President

Cc: Board of Directors, NAACP
    Lou Blanas Sherrif
    Chief Scott Harris

*[Handwritten notes:]*

*Kate,
Thank you for
your hard work
✡︎*

*KATE – I admire
your drive and work
ETHIC – THANK YOU Kate,
FOR YOUR
PROFESSIONALISM.
CAPTAIN ALLEN*

*Thank you for your
efforts and professionalism
in this project
✡︎ I McMahon*

Complaint                                                                 Case No.

DIG
DHILLON LAW GROUP INC.