UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| KATE ADAMS,<br><br>  Plaintiff,<br><br>  v.<br><br>COUNTY OF SACRAMENTO, a political subdivision of the state of California; SHERIFF SCOTT JONES in his individual and official capacity as Sheriff of the County of Sacramento, and DOES 1-10<br><br>  Defendants. | No. 2:22-cv-01499 WBS KJN<br><br>MEMORANDUM AND ORDER RE: DEFENDANTS' MOTION TO DISMISS |

----oo0oo----

Plaintiff Kate Adams brought this action against the County of Sacramento, Sheriff Scott Jones, and Does 1 through 10 (collectively "defendants"), alleging violations of her federal civil rights and of state law stemming from events surrounding her resignation as Chief of Police of Rancho Cordova, California. (Compl. (Docket No. 1).) She asserts claims for (1) procedural due process under the Fourteenth Amendment; (2) violation of the

1

First Amendment; (3) First Amendment conspiracy; (4) false light; (5) false light conspiracy; (6) violation of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940(h); (7) violation of the California Public Safety Officer Procedural Bill of Rights ("PBOR"), Cal. Gov. Code § 3300 et seq; (8) intentional interference with prospective economic advantage; and (9) intentional infliction of emotional distress. (Id.) Defendants now move to dismiss plaintiff's complaint in its entirety. (Mot. (Docket No. 7-1).)

I.  Factual Allegations

Plaintiff began working for the Sacramento County Sheriff's Office ("Department") in 1994. (Compl. ¶ 18.) In March 2020, plaintiff was selected as the Chief of Police for the City of Rancho Cordova. (Id. ¶ 34.)

Prior to her selection for Chief of Police, plaintiff was contacted in February 2019 about possible misconduct involving Sheriff's Captain LeeAnneDra Marchese. (Id. ¶ 28.) Plaintiff forwarded the allegation to the Department's Internal Affairs Division. (Id. ¶ 29.)

In November 2019, nine months after forwarding the complaint about Marchese, plaintiff alleges she received the first complaint ever filed against her in her 25 years as a law enforcement officer. (Id. ¶ 31.) Shortly after, two more complaints were filed against plaintiff alleging similar instances of misconduct.[1] (Id. ¶¶ 33, 35.) The Sheriff's

---

[1] The complaints alleged that plaintiff had (1) improperly used her home retention vehicle to transport her daughter to softball practice and (2) used a homophobic slur at one of her daughter's softball events. (Id. ¶¶ 32-33, 35.) All

2

Department's Internal Affairs Office investigated all threes complaints, formally concluded they were baseless, and cleared plaintiff of any wrongdoing. (Id. ¶¶ 32-33, 35.) Plaintiff alleges that she grew suspicious that either Marchese or Assistant Commander Gail Vasquez[2] were responsible for the complaints.[3] (Id. ¶ 38.)

As a result of these complaints and her growing suspicions about who was responsible, plaintiff submitted a formal complaint with Sacramento County's Equal Employment Opportunity ("EEO") office against Marchese for harassment and retaliatory behavior. (Id. at 42.) Plaintiff alleges that when Marchese was interviewed regarding the EEO complaint, Marchese disclosed that plaintiff had sent text messages which included racist images[4] to her and Morrissey (Vasquez's husband) seven

---

three complaints were anonymous. (Id.)

[2] Assistant Commander Vasquez is married to Sergeant Morrissey, who is the recipient of the racist images which set off the events underlying this case. (Id. ¶ 38.)

[3] Plaintiff alleges that she was suspicious the complaints were submitted by either Marchese or Vasquez because (1) they seemed to be written by someone in the Department who had known plaintiff for many years; (2) Marchese's daughter played in the same softball league as plaintiff's daughter; and (3) plaintiff had seen Marchese driving down her street when she had been assigned to work twenty-nine miles way. (Id. ¶¶ 37-41.)

[4] Plaintiff uses the term "meme" throughout the complaint to refer to these images. Merriam-Webster defines "meme" as "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media." *Meme*, Merriam-Webster.com Dictionary (Dec. 29, 2022), https://www.merriam-webster.com/dictionary/meme. The racist images at issue do not fit the definition of "meme" because they have not spread widely online nor are they amusing in any way. Therefore, the court will use the term "image."

1  years earlier.⁵  (Id. ¶ 43.)  Marchese and Vasquez are the two
2  people plaintiff had suspected were responsible for the three
3  complaints filed against her.⁶  (Id. ¶ 38.)
4       When Marchese shared the details of the text messages
5  during the EEO investigation interview, she provided printed
6  screenshots.  (Id. ¶ 45.)  Plaintiff alleges that Marchese had
7  "miraculously" printed these screenshots, which failed to include
8  the larger context of the text message conversation, despite
9  having previously disposed of the phone on which she received the
10 text messages.  (Id.)  Plaintiff similarly alleges that Marchese
11 was also somehow aware that Morrisey had not only received the
12 same text messages but had also printed screenshots.  (Id. ¶¶ 48-
13 49.)  Plaintiff further alleges that Doe defendants "collectively
14 hid and distorted the original context and language accompanying
15 the images to suggest that [plaintiff] somehow endorsed or
16 supported the images' racist message."⁷  (Id. ¶ 51.)

---

⁵ Plaintiff did not provide details about the racist image in her complaint. According to defendants' motion to dismiss, the image contained a depiction of a "white man wearing sunglasses and holding a beer, spraying a Black child in the back of the head with a garden hose. The caption reads: 'Go be a n[*****] somewhere else.'" (Mot. at 3.) Both defendants' motion and the Sacramento Bee article (which, as explained later, set off the chain of events leading to plaintiff's alleged constructive discharge) spell out the "N-word." However, the court declines to do so here because the word is extremely harmful and doing so is unnecessary to convey the meaning of the image's caption.

⁶ Plaintiff does not offer an explanation as to why Marchese and Vasquez continually targeted plaintiff other than they were acting in retaliation for plaintiff previously forwarding the complaint regarding Marchese. (Id. ¶ 38.)

⁷ While plaintiff only asserts this allegation explicitly against Doe defendants, she implies Morrisey was involved by

1       At the time of the text messages, New Year's Eve 2013, plaintiff alleges she and Morrissey had been engaged in a "casual text message conversation," wishing one another Happy New Year's and sharing videos of plaintiff's children playing. (Id. ¶ 22.). Plaintiff alleges that during this conversation she sent Morrissey the racist image along with the message: "Some rude racist just sent this!!" (Id. ¶ 24.) Morrissey replied: "That's not right." (Id. ¶ 24.) Plaintiff replied back with a similar image and text message stating: "Oh, and just in case u [sic] think I encourage this . . . ."[8] (Id. ¶ 24.) Notably, plaintiff does not mention that she sent the same text messages to Marchese nor who originally sent the racist images to her.

        Upon learning about the text messages, the Department shifted its EEO investigation from investigating the anonymous complaints filed against plaintiff into an investigation about the text messages. (Id. ¶¶ 52-53.) Defendant Sheriff Jones selected John McGinnis,[9] allegedly a close personal friend and political endorser of Jones, to investigate. (Id. ¶ 62.) Plaintiff alleges that the standard procedure, however, is for the County's inspector general to conduct these types of

---

explaining that Morrisey was a cell phone forensics specialist for the Department and "possesses extensive expertise in recovering lost, deleted, or erased cell phone content." (Id. ¶¶ 50-51.)

    [8]   Plaintiff alleges that what was written after the ellipses remains unknown, as it was not included in the screenshots of the text message conversation. (Id. ¶ 24.)

    [9]   While neither plaintiff nor defendants provide any information about John McGinnis, the court is aware that McGinnis is a former Sacramento County Sheriff.

investigations.  (Id.)

At the conclusion of the investigation, plaintiff alleges the Department presented her with a choice: resign and avoid the racist images from becoming public or be terminated and risk her reputation.  (Id. ¶ 58.)  Plaintiff alleges the Department wanted plaintiff to resign "out of a desire to conceal from the public the fact that its officers had failed to report a purportedly racist communication by a fellow officer for over seven years"[10] and "her resignation was the best way to avoid a 'media circus' that could harm the reputations and political futures of all involved."[11]  (Id. ¶¶ 59-60.)

On September 12, 2021, plaintiff resigned as the Chief of Police for the City of Rancho Cordova.  (Id. ¶ 21.)  Plaintiff alleges that defendants' "threat to make the false allegations public unless she resigned, and the terrifying potential consequences for her family if those allegations played out in the media, was paramount in her decision to retire."  (Id. ¶ 61.)  At the time of her resignation, the text messages were not public.

However, on March 4, 2022, the Sacramento Bee ("Bee")

---

[10] Plaintiff alleges that it was department policy for "'[any] individual . . . who is aware of discrimination . . . in a [c]ounty work situation,' to 'immediately report such action or inaction.'"  (Id. ¶ 47.)

[11] Plaintiff alleges that Jones was particularly concerned about his reputation and political future because he had announced his intention to run for Congress and "was perceived by many to have a negative track record on race relations."  (Id. ¶ 60.)

6

published an article about plaintiff's resignation.[12]  (Id. ¶ 71). The Bee article was based on an open letter published by the President of the Sacramento chapter of the NAACP[13] as well as statements made by a Sacramento County spokesperson in response to the Bee's request for comment.  (Id. ¶ 72.)  The Bee article stated: "A Sacramento County spokesperson . . . said the outside investigation concluded, and that the involved employee retired voluntarily before the Sheriff's Office could formally hand down discipline."  (Defs.' Req. for Judicial Notice, Ex. A, at 6 (Docket No. 7-2).)

Six days after the Bee article was published, William Jessup University requested plaintiff resign from her position as adjunct professor.  (Id. ¶ 78.)  Roughly a month later, plaintiff was informed by the California Commission on Peace Officer Standards ("POST") that she could not be hired despite passing

---

[12]  Defendants have requested that the court take judicial notice of the Bee article.  (Docket No. 7-2.)  An electronic copy of the article can be found online at <https://www.sacbee.com/news/local/article259055368.html>. Judicial notice may be taken of a fact "not subject to reasonable dispute in that it is capable of accurate and ready determine by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  "Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true."  Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d 954, 960 (9th Cir. 2010).  Accordingly, the court will take judicial notice of the article for the fact of the statements in the article, rather than the truth of these statements.

[13]  At the hearing, plaintiff's counsel stated that, since the filing of the complaint, the NAACP had confirmed that it was the Department who had provided the NAACP with information about the text message incident and the internal investigation against plaintiff.

7

the entry exam with a score of 90 out of 100.  (Id. ¶¶ 70, 79.) Plaintiff alleges that she then decided to "file this lawsuit to defend her reputation . . . ."  (Opp'n at 5.)

II. Discussion

    A.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows for dismissal when the plaintiff's complaint fails to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6). "A Rule 12(b)(6) motion tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  The inquiry before the court is whether, accepting the allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor, the complaint has alleged "sufficient facts . . . to support a cognizable legal theory," id., and thereby stated "a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In deciding such a motion, all material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn from them.  Id.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

    B.    Procedural Due Process (Claim 1)

To state a procedural due process claim in a § 1983 action, the plaintiff must establish: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; and (3) lack of process."  Shanks v. Dressel, 540 F.3d 1082, 1090 (9th Cir. 2008) (citation omitted). Here, defendants do not challenge that plaintiff had a property

interest in her public employment as chief of police for the city of Rancho Cordova.  Rather, defendants argue that plaintiff's procedural due process claim must fail because she voluntarily resigned.[14]

Plaintiff contends that she did not voluntarily resign but rather she was constructively discharged.  (See Compl. ¶ 89.)  A resignation "may be involuntary and constitute a deprivation of property for purposes of a due process claim" where "a reasonable person in [that] position would feel [they] had no choice but to [resign]."  Knappenberger v. City of Phoenix, 566 F.3d 936, 940-41 (9th Cir. 2009) (no constructive discharge where plaintiff resigned to maintain his health insurance coverage because he had not been informed that he would be terminated and he had the ability to oppose investigation) (quoting Kalvinskas v. Cal Inst. of Tech., 96 F.3d 1305, 1307-08 (9th Cir. 1996) (constructive discharge where plaintiff was given "no choice but to retire"

---

[14] Defendants also argue plaintiff's procedural due process claim must fail because she failed to exhaust administrative remedies.  (See Mot. at 9-10.)  However, "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983."  Patsy v. Bd. of Regents of State of Fla., 457 U.S. 496, 516 (1982).  The overwhelming majority of cases hold that, under Patsy, 457 U.S. at 516, failure to exhaust does not bar a § 1983 claim.  See e.g., Heck v. Humphrey, 512 U.S. 477, 480 (1994) (distinguishing the lack of exhaustion requirement for § 1983 from the federal habeas corpus statute); Heath v. Cleary, 708 F.2d 1376, 1379 (9th Cir. 1983) (finding plaintiff did not need to exhaust under Patsy); Rios v. Cnty. of Sacramento, 562 F. Supp. 3d 999, (E.D. Cal. 2021) (J. Mueller) ("Exhaustion is not a prerequisite to an action under § 1983.") (citing Patsy, 457 U.S. at 102)); Mahoney v. Hankin, 539 F. Supp. 1171, 1174 (S.D. N.Y. 1984) ("[P]laintiff needed to exhaust neither the state administrative remedies nor the remedies under the collective bargaining agreement before the case could be heard . . . .").

9

because employer reduced his income stream to zero by offsetting his disability benefits with pension benefits that he could obtain only by retiring)).

Plaintiff alleges she was forced to resign to protect her ability to earn a living and was told that she would be terminated if she did not resign. (Compl. ¶¶ 58, 66.) Furthermore, she alleges she could not oppose her termination as doing so would publicize the racist text messages, and avoiding that publicity and inevitable backlash was driving force behind her decision to resign. (Id. ¶¶ 61, 66.)  However, plaintiff does not state who informed her that she was to be terminated if she did not resign, or whether the person who notified plaintiff even had the authority to terminate her or to speak on behalf of whoever did have such authority.  Further, plaintiff makes no allegations as to exactly what she was told regarding her alleged choice to resign or be terminated, for example whether she was told she would just be summarily terminated or that the procedures necessary to terminate her would be initiated. Plaintiff's allegations, without more, are not sufficient to allege a procedural due process violation based on a constructive discharge theory.

    C.    First Amendment (Claims 2 and 3)

Plaintiff asserts two claims arising out of the First Amendment: violation of First Amendment's protection on freedom of speech (Claim 2) and conspiracy to deprive plaintiff of her First Amendment right to free speech (Claim 3).  To determine whether a government employer has violated the First Amendment, the Ninth Circuit applies a five-part test which asks:

10

```
                    (1) whether the plaintiff spoke on a matter
                    of public concern; (2) whether the plaintiff
                    spoke as a private citizen or public
                    employee; (3) whether the plaintiff's
                    protected speech was a substantial or
                    motivating factor in the adverse employment
                    action; (4) whether the state had an adequate
                    justification for treating the employee
                    differently from other members of the general
                    public; and (5) whether the state would have
                    taken the adverse employment action even
                    absent the protected speech.
```

Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009).

"Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" Johnson v. Multnomah Cnty., 48 F.3d 420, 422 (9th Cir. 1995) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)).  Conversely, "speech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.'" Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003) (quoting McKinley v. City of Eloy, 705 F.2d 1110, 1114 (9th Cir. 1983).  To determine "whether an employee's speech addresses a matter of public concern," a court must consider "the content, form, and context of a given statement, as revealed by the whole record." Eng, 552 F.3d at 1070 (citations and quotations omitted).

Here, plaintiff alleges her speech -- the text messages containing racist images -- was of public concern because she was condemning an example of racism.  (See Compl. ¶ 98.)  Certainly, acts of overt racism within a police force is a subject that would warrant public concern.  See Lamb v. Montrose Cnty.

11

Sheriff's Off., No. 19-1275, 2022 WL 487105, at *8 (10th Cir. 2022) ("[R]acism and unprofessionalism in a public entity -- particularly law enforcement -- can be matters of public concern, in a general sense."). However, "[t]he Supreme Court has warned us that speech 'not otherwise of public concern does not attain that status because its subject matter could, in a different circumstance, have been the topic of communication to the public that might be of general interest.'" Desrochers v. City of San Bernadino, 572 F.3d 703, 717 (9th Cir. 2009) (quoting Connick, 461 U.S. at 148, n. 8).

Plaintiff fails to make any allegation that either the text messages or the surrounding context suggest any "conduct [which] amount[s] to 'actual or potential wrongdoing or breach of public trust.'" Desrochers, 572 F.3d at 712 (quoting Connick, 461 U.S. at 148); see also McKinley, 705 F.2d at 1114 ("[T]he competency of the police force is surely a matter of great public concern."). Plaintiff's speech as she herself characterized -- "condemning an example of racism to a friend" -- does not allege racist behaviors of any individual members of the Department nor the Department as a whole. Plaintiff makes no allegation that the racist images were in any way related to her job as chief of police. Moreover, the text messages were not intended for public viewing, weighing against a finding of public concern. See Lamb, 2022 WL 487105, at *7 (explaining that a text message to a friend which is "not intended for public dissemination . . . weigh[s] against finding it involved a matter of public concern").

In viewing the facts in the light most favorable to plaintiff as the court must at this stage, the court finds that

12

plaintiff's speech was not a matter of public concern because the speech was intended to be private and does not relate to the personnel or functioning of the Department.  Because the speech was not a matter of public concern, the court's inquiry stops.  See Eng, 552 F.3d at 1070.  Accordingly, plaintiff has failed to allege facts sufficient to support a claim for violation of the First Amendment.

Because plaintiff's First Amendment claim fails, her First Amendment conspiracy claim must also fail.  See Crowe v. Cnty. of San Diego, 608 F.3d 406, 440 (9th Cir. 2010) ("To establish liability for a conspiracy in a § 1983 case, a plaintiff must 'demonstrate the existence of an agreement or meeting of the minds' to violate constitutional rights.").  Accordingly, the court finds plaintiff has failed to state a claim for conspiracy to violate the First Amendment.

D.   False Light (Claims 4 and 5)

Plaintiff asserts two claims based on false light: false light (Claim 4) and conspiracy to place plaintiff in a false light (Claim 5).  "False light is a species of invasion of privacy . . . ."  Balla v. Hall, 59 Cal. App. 5th 652, 687 (4th Dist. 2021) (quotations and citations omitted).  To state a claim for false light, a plaintiff must plead that "(1) the defendant caused to be generated publicity of the plaintiff that was false or misleading, and (2) the publicity was offensive to a reasonable person."  Pacini v. Nationstar Mortg., LLC, No. C 12-04606 SI, 2013 WL 2924441, at *9 (N.D. Cal. June 13, 2013) (citing Fellows v. Nat'l Enquirer, Inc., 42 Cal.3d 234, 238-39 (1986)).  "Even if they place the person in a less than

13

1 flattering light, the published facts are not actionable if they
2 are true or accurate." Pacini, 2013 WL 2924441, at *9 (citing
3 Fellows, 42 Cal. 3d at 238).

4     Plaintiff's false light claim is based on the Bee
5 article. Specifically, plaintiff contends that members of the
6 Department provided misleading comments by telling the Bee that
7 plaintiff retired to avoid discipline as opposed to explaining
8 that the Department asked her to resign to avoid negative media
9 coverage. (See Compl. ¶ 121-23.) The relevant portion of the
10 Bee article states: "A Sacramento County spokesperson . . .
11 [said] that the involved employee retired voluntarily before the
12 Sheriff's Office could formally hand down discipline." (Defs.'
13 Req. for Judicial Notice, Ex. A.) However, because plaintiff
14 fails to make any allegation as to who from the Department spoke
15 to the Bee or what information about the Department's
16 investigation was shared with the Bee plaintiff has failed to
17 allege facts sufficient to support a false light claim.

18     Because plaintiff's false light claim fails, her false
19 light conspiracy claim also must fail.[15] See Thompson v. Cal.
20 Fair Plan Assn., 2221 Cal.App.3d 760, 767 (1990) ("A civil
21 conspiracy does not give rise to a cause of action unless a civil
22 wrong has been committed resulting in damage.").

23     E.   California Fair Housing and Employment Act (Claim 6)
24     FEHA provides in part that it is unlawful "[f]or any

---

[15] "The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design." See Doctors' Co. v. Super. Ct., 49 Cal. 3d 39, 44 (1989) (quotations and citations omitted).

employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." Cal. Gov. Code § 12940(h).  To state a claim of retaliation under Cal. Gov. Code § 12940(h), "a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005).  If plaintiff establishes a prima facie case, the employer is then "required to offer a legitimate, nonretaliatory basis for the adverse employment action in order to shift the burden back to the plaintiff, who must then prove intentional retaliation." McCoy v. Pacific Mar. Ass'n, 216 Cal. App. 4th 283, 298 (2nd Dist. 2013) (citing Yanowitz, 36 Cal. 4th at 1042).

Here, plaintiff alleges she engaged in a protected activity by filing a formal complaint with Sacramento County's EEO.  (Compl. ¶¶ 42, 135-36.)  She further alleges that she was subjected to an adverse employment action because of the "hostile work environment"[16] and her alleged constructive discharge.[17]

---

[16]   The hostile work environment plaintiff describes relates almost entirely to the three complaints against her that were investigated and found to be baseless.  Plaintiff filed a formal complaint with the EEO as a result of these complaints.  (Id. ¶ 42.)  Nevertheless, because these complaints occurred before plaintiff filed her EEO complaint, they could not have been filed in retaliation to her filing of the EEO complaint.

[17]   A constructive discharge claim "is not necessary to

(Id. ¶ 137.)  Assuming the plausibility of these allegations, plaintiff's allegations as to the causal connection between her filing the EEO complaint and her constructive discharge, however, are attenuated at best.  Although plaintiff alleges facts showing that the text messages at issue were revealed to the County by Marchese when Marchese was interviewed during the EEO investigation,[18] that the text came to light as a result of plaintiff's EEO complaint does not mean that she was "discharge[d], expel[led], or otherwise discriminate[d] against" because she filed the complaint.

On this point, Flores v. City of Westminster is instructive.  See 873 F.3d 739 (9th Cir. 2017).  In Flores, a police officer alleged that, as a result of his filing a discrimination complaint, he was removed from a list of officers chosen to perform extra duties, received negative comments from a supervisor in an entry log, and received his first written reprimand.  Id. at 749.  The officer alleged that he had not engaged in any other conduct which would have warranted these adverse employment actions.  As such, the officer was able to establish a causal connection between his filing of the complaint and the adverse employment actions.  Id. at 750-51.

Here, plaintiff alleges that Marchese disclosed the text messages when interviewed as part of the EEO investigation in "a blatant attempt . . . to distract from the investigation

---

find unlawful retaliation."  McCoy, 216 Cal. App. 4th at 301 (citing Yanowitz, 36 Cal. 4th at 1053-54).

[18]  Plaintiff suggests Marchese came forward with the text messages "to distract from the investigation into her own misconduct."  (Compl. ¶ 44.)

16

into her own misconduct." (Compl. ¶ 44.) Plaintiff also alleges she was constructively discharged by the County because of a shared desire to keep the text messages out of the public thereby avoiding a "media circus." (Id. ¶¶ 60-61.) Thus, by plaintiff's own telling, the County did not constructively discharge plaintiff in retaliation for filing the EEO complaint. Rather, the text messages that came to light during the investigation into the EEO complaint led to plaintiff's eventual resignation. Other than the County's reaction to the text messages and desire to keep them out of the public eye, plaintiff alleges no facts sufficient to show a causal connection between the filing of her EEO complaint and her constructive discharge. Accordingly, plaintiff has failed to state a claim under Cal. Gov. Code § 12940(h).

F.  Public Safety Officer Procedural Bill of Rights (Claim 7)

The PBOR provides in part: "No chief of police may be removed by a public agency, or appointing authority, without providing the chief of police with written notice and the reason or reasons therefor and an opportunity for administrative appeal." Cal. Gov. Code § 3304. As explained above, plaintiff resigned before the County had the opportunity to provide her due process. Because she was not "removed", there was no requirement to provide her with the notice and opportunity for appeal referenced in § 3304. Plaintiff cannot decline to avail herself to the County's procedures and then claim that the procedures were unavailable. Accordingly, plaintiff has failed to allege facts sufficient to support a PBOR claim.

17

IT IS THEREFORE ORDERED that defendants' motion to dismiss the complaint (Docket No. 7-1) be, and the same hereby is, GRANTED.[19]  Plaintiff has twenty days from the date of this Order to file an amended complaint, if she can do so consistent with this Order.

Dated:  January 10, 2023

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

[19] Plaintiff brought her eighth claim (intentional interference with prospective economic advantage) and ninth claim (intentional infliction of emotional distress) only against Doe defendants.  (Compl. ¶¶ 151, 159.)  Those claims are dismissed because plaintiff has failed to identify any specific individual responsible for the conduct alleged in them.

18